Leona **FIALKOWSKI**, as mother and Administratrix of the Estate of Walter Fialkowski, and Marion Fialkowski, as father of Walter Fialkowski, Appellants,

v.

**GREENWICH HOME FOR CHILDREN, INC.; Marva Lucas; Northeast Community Mental Health and Mental Retardation Center, Inc.; Richard C. Surles, Administrator, Office of Mental Health and Mental Retardation, City of Philadelphia; and Russell G. Rice, Jr., Regional Commissioner of Mental Retardation, Commonwealth of Pennsylvania, Appellees.**

No. 90–1136.

United States Court of Appeals, Third Circuit.

Argued July 31, 1990.

Decided Dec. 6, 1990.

Rehearing and Rehearing In Banc Denied Jan. 3, 1991.

Alan M. Sandals (argued), Peter R. Kahana, Berger & Montague, P.C., Philadelphia, Pa., for appellants.

Andrew M. Duchovnay (argued), Rawle & Henderson, Philadelphia, Pa., for appellees.

Before HIGGINBOTHAM, Chief Judge, and SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

ALITO, Circuit Judge:

Leona and Marion Fialkowski ("the Fialkowskis"), appeal from a district court order granting summary judgment in favor of Northeast Community Mental Health and Mental Retardation Center, Inc. ("Northeast"), in their action seeking damages for the tragic choking death of their profoundly retarded adult son, Walter Fialkowski. Since we conclude that the undisputed facts cannot support a verdict against Northeast under the Due Process Clause of the Fourteenth Amendment or under state tort law, we will affirm.

## I.

A. Walter Fialkowski, who was 33 years old at the time of his death, suffered from an eating disorder known as food shovelling and a hypoactive (i.e., abnormally low) gag reflex. Food shovelling is the act of stuffing excessive quantities of food in the mouth at one time; a hypoactive gag reflex renders a person abnormally susceptible to choking. As a result of Walter Fialkowski's condition, special precautions were necessary to prevent him from choking.

Walter Fialkowski lived at home and was cared for by his family from birth until age 21, when his parents placed him at the Woodhaven Center, a training facility for the mentally retarded. Two years later, the Fialkowskis felt that their son was no longer improving at Woodhaven Center and decided to transfer him to a group home.

The Fialkowskis made use of the system established by the Commonwealth of Pennsylvania "[t]o assure ... the availability and equitable provision of adequate ... mental retardation services to all persons who need them." 50 PA.STAT.ANN. § 4201 (Purdon 1969). Under this system, counties, including Philadelphia, have the duty to evaluate the needs of mentally retarded persons and to develop plans to meet those needs. 50 PA.STAT.ANN. §§ 4301–05 (Purdon 1969).

In order to ensure that necessary services are provided, each county mental health and mental retardation administrator is required to arrange for the operation of a "base service unit" ("BSU") (55 PA.CODE § 4210.21). A county may operate a BSU with its own staff or contract for an outside organization to serve as the BSU. 55 PA.CODE § 4210.26. Philadelphia entered into such a contract with Northeast, a nonprofit organization.

As the BSU handling Walter Fialkowski's case, Northeast had the responsibility, among others, for performing an "intake study" (55 PA.CODE §§ 4210.22(1), 6201.-13) and, if necessary, making arrangements for him to receive services directly from another facility under contract with the local authorities (55 PA.CODE § 4210.101(d)). Northeast referred Walter Fialkowski to what is called under the Pennsylvania regulations a "Community Rehabilitation Residential Service" ("CRRS")[1], commonly described as a "community living arrangement" or CLA.[2] Walter Fialkowski was one of the first severely retarded persons in Philadelphia to reside in such a facility.

The CRRS in which Walter Fialkowski was voluntarily placed by his parents was

---

1. A CRRS is defined as an "individual premises" in which care is provided for one or more mentally retarded persons. 55 PA.CODE § 6400.5.

2. See, e.g., Halderman v. Pennhurst State School and Hospital, 901 F.2d 311, 322 (3d Cir.1990).

operated by a private entity, Greenwich Home for Children, Inc. ("Greenwich"), under contract with the City of Philadelphia. One other mentally retarded person shared this facility with Walter Fialkowski, and a Greenwich staff member was present in the facility at all times. Walter Fialkowski had his own room, assisted in maintaining the house, and was free to leave the home under staff supervision. During weekdays, he generally attended educational programs at another facility under contract with the City of Philadelphia. On the day of his accident, he did not attend this program due to a mild illness. Greenwich arranged for Marva Lucas, a part-time employee, to supervise him at the CRRS. Lucas prepared two peanut butter sandwiches and cut them into quarters. When she turned her back momentarily, Walter apparently stuffed all of the sandwich quarters into his mouth and choked. Despite emergency efforts, he died.

B. The Fialkowskis began this action in 1986, naming as defendants Northeast, Greenwich, and Lucas, as well as the Pennsylvania Regional Commissioner of Mental Retardation (Russell G. Rice, Jr.) and the administrator of the Philadelphia Office of Mental Health and Mental Retardation (Richard C. Surles). Count one of the complaint asserted a claim under 42 U.S.C. § 1983 for alleged violation of Fourteenth Amendment due process rights. Count two asserted a pendent state tort claim. The complaint sought compensatory and punitive damages and declaratory relief. The claims against Rice were subsequently dismissed on Eleventh Amendment grounds, and the Fialkowskis do not contest that dismissal on appeal.

After discovery, Northeast, Greenwich, and Lucas moved for summary judgment. The district court held that the Section 1983 claim was foreclosed by the Supreme Court's recent decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), because the defendants owed no constitutional duty to protect a person who was not in involuntary custody. The court also granted summary judgment in favor of Northeast and Lucas on the

pendent state claim. The court noted that Northeast, as a nonprofit health care provider, was immune from a simple negligence claim under 50 PA.STAT.ANN. § 4603 (Purdon 1969) for anything done pursuant to the Pennsylvania Mental Health and Mental Retardation Act, 50 PA. STAT.ANN. § 4101 et seq.; the court likewise observed that Lucas, as a person employed under the Act, enjoyed the same limited immunity. The court then concluded that "the evidence, which would be available to plaintiffs at the time of trial, is insufficient to establish more than simple negligence on the part of [Northeast or Lucas]." By contrast, however, the court denied summary judgment for Greenwich on the state tort claim because Greenwich was not a nonprofit organization and thus lacked any civil immunity under 50 PA. STAT.ANN. § 4603 (Purdon 1969).

The Fialkowskis moved for reconsideration in light of this court's subsequent decision in *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). While this motion was pending, the Fialkowskis reached a settlement with Greenwich and Lucas. Shortly thereafter, the district court granted reconsideration but affirmed its earlier decision. The district court explained that under *DeShaney*, "plaintiffs could establish no set of facts which would impose upon defendants a constitutional duty to protect plaintiffs' decedent where his liberty was not restricted by defendants and his injury resulted from his own conduct." The court added that the "alternate theories of liability discussed in *Stoneking* are simply inapposite under the factual setting of this case." Finally, with respect to the pendent claim, the court reiterated its holding that the evidence available to the Fialkowskis could not show anything more than simple negligence on the part of Northeast or Lucas. This appeal followed.

II.

■ We turn first to the question whether the district court properly granted summary judgment in favor of Northeast on

the Fialkowskis' pendent state tort claim. In order to prevail on their state tort claim, the Fialkowskis bore the burden of proving that Northeast, as a "recognized nonprofit health or welfare organization or agency," was guilty of "gross negligence or incompetence." 50 PA.STAT.ANN. § 4603 (Purdon 1969).[3] Consequently, when Northeast moved for summary judgment "after adequate time for discovery," the district court was mandated to grant that motion unless the Fialkowskis made "a showing sufficient to establish the existence" of gross negligence, an essential element on which they bore the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Employing this legal standard, the district court concluded that the Fialkowskis' proof could establish no more than simple negligence on the part of Northeast.

Applying the same test as the district court,[4] we likewise conclude that the Fialkowskis' proof was not sufficient to establish that Northeast was guilty of gross negligence.[5] The meaning of the term "gross negligence" in 50 PA.STAT.ANN. § 4603 (Purdon 1969) is not defined by statute or by any Pennsylvania cases decided under that provision.[6] Moreover, degrees of negligence are not generally recognized under Pennsylvania common law (*Ferrick Excavating v. Senger Trucking*, 506 Pa.

181, 484 A.2d 744, 749 (1984)), although the concept is employed in immunity statutes like that at issue here. *See* 42 PA.CONS. STAT.ANN. § 8331–32 (good Samaritan civil immunities); § 8336 (civil immunity for persons rendering requested assistance involving transportation of hazardous substances).[7] Lacking any other indication of legislative intent, we assume that "gross negligence" in 50 PA.STAT.ANN. § 4603 (Purdon 1969) has the generally accepted meaning of that term.

Gross negligence generally signifies "a greater want of care" than is implied by ordinary negligence, (*Milwaukee & St. Paul Ry. Co. v. Arms*, 91 U.S. 489, 495, 23 L.Ed. 374 (1876)), which in turn means "no more than a failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); *see also Gift v. Palmer*, 392 Pa. 628, 141 A.2d 408, 409 (1958); *Lambert v. PBI Industries*, 244 Pa.Super. 118, 366 A.2d 944, 949 (1976). Gross negligence has also been described as "the want of even scant care" and the "failure to exercise even that care which a careless person would use." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts*, § 34 at 183 (5th ed.1984). *See also* 57A Am.Jur.2d *Negligence* § 243 (1989); 65 C.J.S. *Negligence* § 8(4) (1966).[8]

---

3. This section was repealed by Act of Nov. 26, 1978, Pub.L. 1399, No. 330, § 802, insofar as it waived or purported to waive sovereign immunity, but was preserved from repeal insofar as it provided defenses or immunities from suit. *See* 53 PA.STAT. § 5311.802. Thus, it remains valid for present purposes.

4. *United Transportation Union v. Conemaugh & Black Lick Railroad Co.*, 894 F.2d 623, 628 (3d Cir.1990); *EEOC v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69, 81 (3d Cir.1984); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976).

5. Although 50 PA.STAT.ANN. § 4603 (Purdon 1969) provides that a nonprofit health organization such as Northeast may be liable for "incompetence," as well as "gross negligence," the Fialkowskis did not allege in their complaint or contend on appeal that Northeast was "incompetent." Accordingly, we do not address the question whether Northeast was guilty of "incompetence," a term not defined by statute or by relevant Pennsylvania case law.

6. For cases holding that the allegations of the complaint were sufficient to state a claim for gross negligence, see *Rhines v. Herzel*, 481 Pa. 165, 392 A.2d 298, 300 (1978) (allegation that state hospital employees allowed homicidal mental patient otherwise requiring maximum security to associate with victim); *Freach v. Com.*, 471 Pa. 558, 370 A.2d 1163, 1165–66 (1977) (allegations that state hospital employees did not properly treat and unlawfully released a patient who had murdered and molested children and who upon release was employed as a special policeman and murdered two children).

7. Under 42 PA.CONS.STAT., "gross negligence" is defined as "[r]eckless, willful or wanton misconduct" (42 PA.STAT. 8336(d)).

8. The few cases defining gross negligence under provisions of Pennsylvania law are fully consistent with these general principles. For example, in *Williams v. State Civil Service Comm.*, 9 Pa. Commw. 437, 306 A.2d 419, 422 (1973), involving the dismissal of a public employee, gross

While the distinction between gross and simple negligence often turns on factual issues, the primary dispute between the parties in the present case relates to the legal authority and responsibilities of Northeast as a BSU. The Fialkowskis argue that Northeast had the legal authority and the obligation to direct or recommend that Greenwich take specified precautions to prevent Walter Fialkowski from choking on a peanut butter sandwich. The Fialkowskis note that in 1982 a client at a CLA operated directly by Northeast choked to death on a peanut butter sandwich; that Northeast thereafter banned peanut butter sandwiches from the CLAs it operated; and that Northeast employees were aware of Walter Fialkowski's eating disorder.

This evidence would certainly have been enough to preclude summary judgment for Northeast if Northeast had been responsible for the day-to-day care of Walter Fialkowski. Under the Pennsylvania statutory and regulatory scheme, however, it is apparent that a BSU does not have that responsibility and that therefore its duty of care with respect to any daily hazards that Walter Fialkowski faced was substantially diminished.

A BSU is defined under Pennsylvania law as an organization "for planning and coordinating services" for mentally retarded persons." 55 PA.CODE § 6400.5. This general role of planning and supervision is explained by several partially overlapping code provisions. *See* 55 PA.CODE §§ 4210.22, 4210.101, 6201.12. In simple terms, the responsibilities of a BSU appear to·fall into the following broad categories. First, a BSU is responsible for "intake," diagnosis, and general planning. A BSU must complete an intake study (55 PA. CODE §§ 4210.22(1), 6201.13), as well as perform a comprehensive diagnosis and evaluation (55 PA.CODE § 6201.12(10)) and develop a comprehensive treatment program (55 PA.CODE § 4210.22(2)) and "a

practical life-management plan" for mentally retarded persons and their families (55 PA.CODE § 6201.12(10)(iii)). Second, a BSU may be responsible for providing service directly to a mentally retarded person or for arranging for services to be provided by another facility under contract with the local authorities (55 PA.CODE §§ 4210.-23(5), 4210.101). Third, a BSU is responsible for coordination and liaison among all concerned with the mentally retarded person (55 PA.CODE §§ 4210.22(3), 6201.12(3), (5), (7), (8)). Fourth, the BSU is required to maintain central files and provide information (55 PA.CODE §§ 4210.22(6), 6201.12(4), (6)). Finally, the BSU is obligated to "[r]eassess the progress of the individual at regular intervals" (55 PA.CODE § 6201.12(10)(iv)).

The role of a BSU with respect to a person such as Walter Fialkowski who is placed in a CRRS is further illuminated by the code provisions governing a CRRS. A CRRS must satisfy detailed requirements and may not operate without a certificate of compliance. 55 PA.CODE § 6400.3. Each CRRS must have a chief executive officer who meets prescribed qualifications relating to education and work experience (55 PA.CODE § 6400.43(a), (c)) and who is responsible for the "general management" of the CRRS, including "[s]afety and protection of residents" (55 PA.CODE § 6400.43(b)(2)). A CRRS must also have a trained "program specialist," who is "responsible for the daily operations of the facility" (55 PA.CODE § 6400.44). In addition, each CRRS must provide "preservice and inservice training" for all staff (55 PA.CODE § 6400.48; *see also* 55 PA. CODE § 5310.41).

While a BSU must develop a general treatment program and life-management plan, as described above, a CRRS has more detailed planning obligations. For each client, a CRRS must develop a written "residential service plan" that focuses on the

---

negligence was defined as the "failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences as to justify a presumption of willfulness or wantonness." This definition was adopted in a diversity case applying an

exculpatory clause of a contract (*Fidelity Leasing Corp. v. Dun & Bradstreet, Inc.,* 494 F.Supp. 786, 790 (E.D.Pa.1980)), and in a diversity bailment case (*Western Mining Corp. v. Standard Terminals, Inc.,* 577 F.Supp. 847 (W.D.Pa.1984)).

client's "strengths and needs" in such areas as "[h]ealth care," "[a]bility to meet nutritional needs," and "[s]elf-care skills." 55 PA.CODE § 5310.33. Each CRRS resident must also have an "individual habilitation plan" that sets out training or educational objectives, a timetable for achieving those objectives, and methods of evaluating progress. 50 PA.CODE § 6400.124.

Perhaps most revealing for present purposes, the Pennsylvania Code prescribes extremely detailed health and safety standards with which every CRRS must comply. There are more than thirty separate code sections concerning the suitability and safety of the CRRS physical site. 55 PA. CODE §§ 5310.71 to 5310.73, 6400.61 to 6400.87. There are also seven code sections on fire safety (55 PA.CODE §§ 6400.-101 to 6400.107), eight sections on the health of residents and staff (55 PA.CODE §§ 6400.151 to 6400.162), and nine sections on nutrition (55 PA.CODE §§ 5310.82, 6400.171 to 6400.178).

When this entire statutory scheme is surveyed, a clear picture emerges with respect to the roles and legal responsibilities of a BSU and a CRRS regarding a client placed in a CRRS. It is apparent that the role of the BSU is to make an initial evaluation, develop a general plan, arrange for placement in a CRRS, foster coordination, and perform a reassessment of the individual's progress from time to time; the BSU does not have the responsibility for prescribing rules governing daily activities in a CRRS or for monitoring the way in which a CRRS addresses the many health and safety risks facing its residents every day. Instead, responsibility for daily activities in a CRRS appears to rest squarely with the CRRS and its trained staff, who operate under close state regulation.

In drawing these distinctions between the roles of a BSU and a CRRS, we do not intend to suggest that those roles do not overlap to some degree or that the role of the BSU is not broad enough to permit it to address some considerations of patient health and safety. We see nothing in the statutes or regulations that prohibits a BSU, in performing its role of planning, coordination, referral, and review, from addressing these concerns or from making safety recommendations to a direct care provider. But a BSU's ability to address health and safety concerns in these limited contexts does not alter the clear picture that emerges from the statutory scheme, *viz.*, that a BSU does not have the responsibility of closely monitoring a CRRS's daily performance in the area of health and safety and that instead each CRRS bears the predominant responsibility for the safety of its residents.

In light of this statutory scheme, the district court was clearly correct in concluding that the Fialkowskis could not establish that Northeast was grossly negligent in performing its duties as a BSU. Northeast's duty of care regarding particular safety hazards faced by Walter Fialkowski in his daily activities at his CRRS was attenuated. Although Northeast probably could have and perhaps even should have made a recommendation to Greenwich regarding the feeding of peanut butter sandwiches to Walter Fialkowski, addressing a safety risk of this nature falls squarely within the area of responsibility of a CRRS, not a BSU. Any failing on the part of Northeast clearly amounted to no more than simple negligence. Thus, entry of summary judgment for Northeast on the Pennsylvania tort claim must be sustained.[9]

## III.

Summary judgment for Northeast on the Fialkowskis' section 1983 claim was also proper because, as the district court

---

**9.** The Fialkowskis contend that summary judgment was improper because they submitted an affidavit by a mental health expert, Sue A. Gant, Ph.D, concluding that Northeast was grossly negligent and reckless in failing to take precautions against choking risks for clients like Walter Fialkowski. Dr. Gant's conclusion, however, necessarily rested on her understanding of Northeast's legal responsibilities as a BSU. Her affidavit does not reflect an accurate and complete understanding of the respective roles of a BSU and CRRS under the Pennsylvania statutory scheme. Under the circumstances, her affidavit was insufficient to preclude summary judgment.

correctly held, the undisputed facts established that Northeast did not violate Walter Fialkowski's Fourteenth Amendment rights. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court addressed "the substantive rights of involuntarily committed mentally retarded persons" under the Due Process Clause. The Court held that these substantive rights include a qualified right to safe conditions and freedom from bodily restraint. Relying on *Youngberg*, the Fialkowskis argue that Northeast violated their son's substantive due process right to safe conditions at the CRRS. The Fialkowskis' argument fails, however, because the substantive rights recognized in *Youngberg* are limited to persons whose personal liberty has been substantially curtailed by the state.

The Due Process Clause provides that a state [10] may not *"deprive* any person of life, liberty, or property, without due process of law" (emphasis added). Thus, the Due Process Clause restricts what a state may take away, but it generally does not impose any affirmative "duty to provide substantive services." *Youngberg*, 457 U.S. at 317, 102 S.Ct. at 2459. In *Youngberg*, the state had acquired an affirmative duty to provide safe conditions only because it had taken a mentally retarded person into custody without his consent. As the Supreme Court later explained in *DeShaney v. Winnebago County Department of Social Services*, 109 S.Ct. at 998, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 1006 (footnote omitted).

Just last year, this court applied *DeShaney* to a factual situation closely related to the case before us. In *Philadelphia Police & Fire Association v. City of Philadelphia*, 874 F.2d 156 (3d Cir.1989), a class of mentally retarded individuals living at home sued the city, alleging that cuts in services violated their substantive due process right to adequate care and treatment. The class members asserted that they were in the state's custody, even though they were living at home, because "Pennsylvania's statutory scheme requires the mentally retarded to enter the system through the BSU's, where a plan for their care, including a placement determination, is made." *Id.* at 167-168. The class also argued that they were "absolutely dependent on the state" and "that cessation of services will end in literal incarceration." *Id.* at 168. Nevertheless, this court held that *DeShaney* "forecloses the class's constructive custody argument because it makes clear that a 'state's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint on personal liberty' is a prerequisite to the state's obligation to provide care." *Id.*, quoting *DeShaney*, 109 S.Ct. at 1006. *See also Horton v. Flenory*, 889 F.2d 454, 458 (3d Cir.1989) (reiterating that *"DeShaney* requires that the state have imposed some kind of limitation on a victim's ability to act in his own interests").

In this case, Walter Fialkowski's personal liberty was not substantially curtailed by the state in any way. His parents voluntarily placed him at the Greenwich Home CRRS; [11] indeed, they specifically sought such a facility because they were not satisfied that he was making sufficient progress at the training facility in which he was previously placed. Not only were the Fialkowskis free to remove their son from the CRRS if they wished, but Walter Fial-

---

**10.** In denying Northeast's motion to dismiss the Section 1983 claim for lack of subject matter jurisdiction, the district court held that the state action was sufficiently pled by virtue of the allegations that Pennsylvania had delegated statutory responsibilities to Northeast. The issue of state action is not before us in this appeal.

**11.** The Fialkowskis' contention that involuntary commitment was not possible under Pennsylvania law is incorrect. *See* 50 PA.STAT.ANN. § 7301, et seq.

kowski himself enjoyed considerable freedom of movement. He was thus not deprived of freedom "through incarceration, institutionalization or other similar restraint of personal liberty." *DeShaney*, 109 S.Ct. at 998.

In an effort to escape the limitations of the doctrine set out in *Youngberg, DeShaney,* and *Philadelphia Police & Fire Association,* the Fialkowskis rely upon *Stoneking v. Bradford Area School District,* 882 F.2d 720 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). In that case, a former student brought a Section 1983 action against her school district and supervisory school officials for injuries arising from sexual abuse perpetrated by a teacher. The denial of the individual defendants' motion for summary judgment based on qualified immunity was appealed to this court prior to the decision in *DeShaney.* After this court's initial decision was vacated and remanded by the Supreme Court for reconsideration in light of *DeShaney,* this court recognized that "an affirmative constitutional duty to provide adequate protection" must be confined to cases in which a person is taken into state custody against his will. *Id.* at 723. Without reaching the question whether students required to attend school under compulsory attendance laws are in custody within the meaning of *DeShaney,* the court held that the complaint stated a due process claim under a different theory. Under this theory, the student's claim was not that the supervisory school officials breached an affirmative duty to protect her from the teacher. Instead, her claim was (1) that the teacher violated due process because, while acting in his capacity as a public employee, he deliberately deprived her of her liberty interest in personal security and (2) that the supervisory school officials were liable for this constitutional violation under Section 1983 and cases such as *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), because they adopted and maintained a policy of deliberate indifference to instances of known or suspected sexual abuse of students by teachers. *Id.* at 724–25.

Although the Fialkowskis contend that their claim fits into the *Stoneking* mold, their briefs do not describe this recast claim in any detail or marshal whatever proof was available to show that summary judgment should not have been entered against them on this claim. Nevertheless, it is apparent that in order to conform their claim to the *Stoneking* pattern, the Fialkowskis would have to allege that (1) someone—presumably Lucas or Greenwich—committed an underlying due process violation and (2) Northeast was liable for this constitutional violation because it adopted or maintained a policy of deliberate indifference regarding such constitutional violations by those under its authority.

The first element of this claim presents the question whether either Lucas or those responsible for the operation of Greenwich acted with the state of mind required for a due process violation. Resolution of this question would require us to confront difficult legal problems. *See Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Williams v. Borough of West Chester,* 891 F.2d 458 (3d Cir.1989); *Freedman v. City of Allentown,* 853 F.2d 1111 (3d Cir.1988); *Colburn v. Upper Darby Township,* 838 F.2d 663 (3d Cir.1988); *Davidson v. O'Lone,* 752 F.2d 817 (3d Cir. 1984) (in banc), *aff'd,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). This question presents difficult factual problems as well. The parties have not briefed the question whether the proof could have shown that Greenwich or Lucas was guilty of gross negligence or recklessness. The district court, in granting summary judgment for Lucas on the Pennsylvania tort claim, concluded that she could not be found to have acted with anything more than simple negligence, but the court did not explain the basis for this conclusion and did not consider whether Greenwich could be found grossly negligent since Greenwich lacked any civil immunity.

We need not confront these legal and factual questions because it is apparent that the second element—the allegation that Northeast implemented a policy of deliberate indifference—was not entitled to survive summary judgment. In *City of*

*Canton v. Harris,* upon which the Fialkowskis rely, the Supreme Court discussed the circumstances in which a municipality may be liable under Section 1983 for constitutional torts committed by the police and allegedly caused by inadequate training. The Court explained that a municipality may be liable only if the failure to train amounts to a municipal "policy." 109 S.Ct. at 1205. This means, the Court stated, that a municipality must make a "deliberate" or "conscious" choice not to provide training regarding certain potential constitutional violations. Such a "deliberate" or "conscious" choice may be shown, the Court continued, if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* (footnote omitted). The Court cautioned that this standard could not be met by showing that "an otherwise sound program has occasionally been negligently administered," that "a particular officer had been unsatisfactorily trained," or that "an injury or accident could have been avoided if an officer had had better or more training." *Id.* at 1206. The Court warned that lower standards "would result in *de facto respondeat superior* liability on municipalities," which the Court had previously rejected in *Monell v. New York Dept. of Social Services,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). *Id. See also Sample v. Diecks,* 885 F.2d 1099, 1116–18 (3d Cir.1989).

We do not believe that the basis for supervisory liability discussed in *City of Canton* or *Sample v. Diecks* can be established in the present case. As previously discussed, Northeast did not have responsibility for supervising daily activities in the Greenwich home. Northeast did not have an employment or even a contractual relationship with Greenwich, an independent corporation under contract with Philadelphia, or with Lucas, a Greenwich employee. Northeast could not hire, fire, or supervise Greenwich staff. Nor was Northeast re-

sponsible for training that staff. Under Pennsylvania regulations, as previously noted, Greenwich itself bore that responsibility. *See* page 464 *supra.* At worst, Northeast failed to warn Greenwich, an independent entity with expertise in the care of mentally retarded persons, about a potential danger facing a particular individual under Greenwich's care. This evidence showed no more than that "an otherwise sound program" did not do everything it might possibly have done on this particular occasion. Accordingly, the available evidence was clearly inadequate to support a Section 1983 claim under *City of Canton* and related cases.

## IV.

In sum, we conclude that the district court properly granted summary judgment for Northeast on both of the Fialkowskis' claims. The judgment of the district court will therefore be affirmed.