Gaylee BRUMMITT, Plaintiff–Appellant,

v.

Cindy SPRINGER and Michael
H. Powers, Defendants–
Respondents.

No. 20127.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 14, 1996.

Motion for Rehearing or Transfer
Denied March 6, 1996.

Application to Transfer Denied
April 23, 1996.

Robert P. Warden, Joplin, L. Thomas Elliston, Webb City, Philip A. Glades, Joplin, for plaintiff-appellant.

Jeremiah W. (Jay) Nixon, Attorney General, John R. Munich, David A. Johnston, Clate Baker, Assistant Attorneys General, Jefferson City, for defendants-respondents.

MONTGOMERY, Presiding Judge.

Gaylee Brummitt (Plaintiff) appeals from an order sustaining a motion to dismiss her two-count petition against Defendants Cindy Springer and Michael Powers. Plaintiff's petition alleged that her daughter, Abigail Rhoades, died as a result of Defendants' negligent acts occurring while Abigail was in foster care.

Both counts of Plaintiff's First Amended Petition name the Defendants as Springer and Powers (describing them as state employees working for the Springfield Regional Center, which is under the direct supervision of the Missouri Department of Health) and Charles and Susan Farris, licensed by the state as foster parents. The Farrises also own and operate a day care center licensed by the state.

After Springer and Powers filed their motion to dismiss, the trial court dismissed Plaintiff's claims against them for failure to state a claim for which relief may be granted and properly designated the dismissal as final for the purposes of appeal. *See* Rule 74.01(b).

Summarized, Count I alleges that Springer was Abigail's case worker and Powers was Springer's direct supervisor. Abigail was a mentally retarded child and required "total care." Plaintiff states that (1) Springer and Powers owed a specific duty to Abigail to ensure her care was in compliance with "Chapter 630 V.A.M.S.,"[1] and (2) their conduct complained of is ministerial in nature and not discretionary.

In 1989, Plaintiff sought the advice and help of the Springfield Regional Center concerning Abigail's care and treatment. An Individual Habilitation Plan (IHP) was developed for Abigail. Eventually, with Plaintiff's consent, Abigail was placed in the Farris foster home after Plaintiff admitted herself into a substance abuse program.

From March 23, 1992, until September 4, 1992, the date Abigail died, she was in the sole care and custody of the Farrises, allegedly under the supervision of the Springfield Regional Center and the Department of Mental Health. As to Abigail's care during this time period, Plaintiff alleges, in part:

18. On March 25, 1992, Abigail was taken by Defendant Susan Farris to Dr. Marla Floyd; she, at this time, weighed 35½ pounds. From this date until May 13, 1992, she is seen by Dr. Floyd for various

---

1. This chapter makes provision for state-assisted treatment and care of those persons afflicted with mental disorders, mental retardation, devel-opmental disabilities, and alcohol or drug problems.

complaints and is, in fact, admitted to Cox South in Springfield, Missouri.

19. Springfield Regional Center's Chronological Case Notes by Cindy Springer state that she visited Abigail at Cox South on 5/14/92 and that her case notes reflect:

"Spoke with the nurse who admitted her. She was concerned because Abi was " "dirty" " [sic] & the area around her feeding tube being " "crusted over" " [sic] with a discharge."

It is further noted that Abigail's weight is 26 lbs.

20. That on June 4, 1992, Abigail is seen by Dr. Yvonne C. Bussman; the medical records note that she now weighs 30½ pounds and that her weight two weeks ago was 28 lbs. The records also note that the Regional Center desires to know the status of her cardiac disease and her neurological condition and further state: "Apparently have noted a regression of her social skills and abilities, in that she can no longer sit up, and is not as responsive as she has been in the past". The medical report also notes concern about her nutritional status.

21. The IHP Plan Review on or about 6/26/92, states that

"Abigail's health continues to be a concern. At the IHP meeting in May, 1992, it was discussed Abi's failure to gain weight. The school also reported that her skills are deteriorating."

22. She is seen by Dr. Marla Floyd on July 2, 1992. Records note her weight as 29 lbs., which is unchanged from her last visit. She is, again, admitted to hospital. History and Physical Examination by Dr. Floyd notes "severe wasting is present." It was also noted that, during her hospital stay, she developed significantly an increased ability to eat and did not note difficulty in swallowing. She weighed 14.1 kg which, according to the records was an increase from 12.4 kg at the time of admission.

23. On August 12, 1992, Springfield Regional Chronological Notes by Defendant Springer state that she "ran into" Susan Farris and Abi at the pediatrician's office. The records do not denote that Abigail Rhoades was visited in the home by Defendant Cindy Springer, except on March 24, 1992 when she took a wheelchair and clothes to Abi.

24. Although discharge notes state that she is to see Dr. Floyd in one week, Abigail is not seen until August 12, 1992, by Dr. Don D. Sponenberg. Medical records state that "exam reveal[s] horrible malnutrition" and denotes her weight as 29 lbs. Another foster child living in the home with Abigail who is also a total care child, Johnny Berry, is also seen by Dr. Sponenberg, who reports his nutritional status as "horrible".

On September 4, 1992, Abigail, after choking on her own vomit, died allegedly in a weakened and malnourished condition while unsupervised in the Farris day care center. Plaintiff alleges that Springer and Powers had a duty to recommend a qualified foster home for Abigail and a duty to ensure that the Farrises met the requirements of "Chapter 630 V.A.M.S." while caring for Abigail.

According to Plaintiff, Springer and Powers were negligent in discharging their duties to Abigail. The gist of their alleged negligence is that they should have personally evaluated and observed Abigail in the foster care home, observed her weight loss and physical deterioration and removed her from the home. Plaintiff asserts that Springer and Powers failed to follow "Chapter 630 V.A.M.S., regulations or in-house procedures" regarding their responsibilities for Abigail's care and treatment.

Plaintiff's first point contends that the trial court erroneously dismissed Count I as to Springer and Powers because, as state employees, "they breached a ministerial duty owed to Abigail Rhoades, imposed by statute and the regulations of the State of Missouri, and their negligent acts and omissions are not protected by official immunity."

In reviewing a motion to dismiss for failure to state a claim, this Court examines the petition, allowing the petition its broadest intendment, treating all facts alleged as true, and construing the allegations favorably to determine whether they invoke principles of substantive law. *Cooper v.*

*Corderman,* 809 S.W.2d 11, 13 (Mo.App.), *cert. denied,* 502 U.S. 944, 112 S.Ct. 385, 116 L.Ed.2d 336 (1991). However, we are not required to accept the petitioner's conclusions as true. *Id.* On appeal, the trial court will be affirmed if any grounds asserted for dismissal are valid. *Id.*

 Under the official immunity doctrine, public officers [2] acting within the scope of their authority are not personally liable in tort for injuries arising from their discretionary acts, functions or omissions. *Kanagawa v. State by and through Freeman,* 685 S.W.2d 831, 835 (Mo. banc 1985). This doctrine provides "that a public official is not civilly liable to members of the public for negligence strictly related to the performance of discretionary duties." *Green v. Denison,* 738 S.W.2d 861, 865 (Mo. banc 1987).

 Discretionary acts involve the exercise of reason in developing a means to an end, and discretion in determining how or whether an act should be done or a course pursued. *Kanagawa,* 685 S.W.2d at 836. In contrast, ministerial functions concern clerical duties to be performed upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to the public officer's own judgment or opinion on the propriety of the act. *Id.* The official immunity doctrine serves society's compelling interest in vigorous and effective administration of public affairs by protecting public officers from fear of personal liability as they make judgments concerning the public safety and welfare. *Id.*

 Before liability in tort exists, a public official must breach a ministerial duty imposed by statute or regulation. *Norton v. Smith,* 782 S.W.2d 775, 777 (Mo.App.1989). In the instant case, the only specific statute Plaintiff mentions is § 630.645,[3] which provides:

The department shall provide or shall arrange for follow-up care and aftercare and shall make or arrange for reviews and visits with the client at least quarterly to the residential facility or day program in which the client has been placed to determine whether the client is receiving care, treatment, habilitation and rehabilitation, including medical care, consistent with his needs and condition. The department shall identify the facilities, programs or specialized services operated or funded by the department which shall provide necessary levels of follow-up care, aftercare, habilitation or medical treatment to clients in certain geographic areas where they are placed. After a client has been placed through the placement program, the department shall, for a period of four months following the initial placement, evaluate and review the progress of the client in the placement at least once a month.

Plaintiff argues that Springer's failure to make regular visits to the Farris foster home and evaluate and review Abigail's progress violated the specific terms of this statute. In other words, Plaintiff believes that had Springer and Powers properly "evaluated and reviewed" the progress of Abigail in the foster home, her death could have been averted by her removal from the improper care the Farrises rendered. Thus, we must determine whether § 630.645 imposed discretionary or ministerial duties upon Springer and Powers.

Clearly, the statute requires that the Department evaluate and review its clients, but nowhere does § 630.645 provide what results shall follow a failure to comply with its terms. Therefore, the statute can only be interpreted as directory in nature. This is true because when a statute provides "what results shall follow a failure to comply with its terms, it is mandatory and must be obeyed, whereas, if it merely requires certain things to be done and nowhere prescribes the results that shall follow if such things are not done, the statute is merely directory." *Meloy v. Reorganized School Dist. R–1 of Reynolds County,* 631 S.W.2d 933, 937 (Mo.App.

---

**2.** This doctrine also applies to public "employees" like Powers and Springer, not just to "higher public officials." *See Green v. Denison,* 738 S.W.2d 861, 865 (Mo. banc 1987); *Sherrill v. Wilson,* 653 S.W.2d 661, 667 (Mo. banc 1983).

**3.** Statutory references are to RSMo 1994, unless otherwise indicated.

1982) (*quoting Hedges v. Dep't of Social Services,* 585 S.W.2d 170, 172 (Mo.App.1979)).

As noted, a ministerial function is a duty to be performed in obedience to the mandate of legal authority. Because § 635.645 is merely directory, it imposes no ministerial duty upon Springer and Powers. *See Norton,* 782 S.W.2d at 778.

Moreover, the statutory requirement that the Department evaluate and review Abigail's progress is necessarily based on the exercise of professional judgment rather than the performance of routine tasks. *See Webb v. Reisel,* 858 S.W.2d 767, 770 (Mo.App.1993) (duties of director of pupil transportation for public school for planning transportation of students required the exercise of judgment rather than the performance of routine tasks in case involving a student injured when struck by an automobile after departing a school bus). The very nature of evaluating and reviewing Abigail's progress required the exercise of reason in determining what course of action should be pursued regarding her stay in the foster home. Plaintiff's own petition illustrates the discretionary nature of Springer and Powers's duties under the statute in question. In paragraph 21, set forth *supra,* Plaintiff quotes from the IHP plan review on June 26, 1992, which shows the concern for Abigail's health recognized by Springer and Powers. Obviously, Springer and Powers were exercising their professional judgment in determining how or whether they should act and in attempting to determine what course of action should be pursued. Because their actions were of the discretionary type, Point I must be denied.

Inasmuch as the official immunity doctrine operates as a complete bar to Plaintiff's action, it is unnecessary to discuss Plaintiff's second point asserting that Springer and Powers are not protected by the public duty doctrine.

■ Plaintiff's last point complains of the dismissal of her claim (Count II) based on a violation of 42 U.S.C. § 1983. Plaintiff contends that she stated a cause of action under this section by alleging Springer and Powers deprived her of a federal right under color of state law.

After alleging the employment status of Springer and Powers, Plaintiff alleges in Count II that these Defendants acted under color of statutes and regulations from April 1992 to September 4, 1992, to deprive Plaintiff and her daughter of rights secured to them by the Fifth and Fourteenth Amendments to the United States Constitution. According to Plaintiff, Springer and Powers, acting with indifference, deprived her and Abigail of their constitutional rights without due process of law in that they failed to (1) timely investigate the Farris foster home, (2) see and observe Abigail at appropriate intervals, (3) adequately supervise and monitor the foster home, (4) be concerned with the safety and protection of Abigail, (5) remove Abigail from the foster home when they knew or should have known of her mistreatment, (6) place Abigail in other available foster homes knowing that she would be mistreated in the Farris foster home.

The trial court dismissed Count II in response to Springer and Powers's motion alleging the petition failed to state a claim upon which relief can be granted as a matter of law. As noted, we must view Count II favorably to Plaintiff, giving the pleadings the benefit of every reasonable intendment.

A petition under 42 U.S.C. § 1983 states a claim for relief if it alleges (1) conduct which is alleged to have subjected the plaintiff to a deprivation of rights, privileges or immunity secured by the United States Constitution, and (2) that such conduct was by one acting under color of state law. *Tyler v. Whitehead,* 583 S.W.2d 240, 242 (Mo.App.1979).

■ The allegations of Count II fall short of meeting requirement (1). The Due Process Clause forbids the state from depriving individuals of life, liberty or property without "due process of law," but it does not require a state to ensure that such interests are not harmed through other means. This is the teaching of *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

In *DeShaney,* plaintiff, a boy beaten and permanently injured by his father, and his mother sued a county department of social services and some of its social workers under

42 U.S.C. § 1983. The defendants had received complaints that plaintiff was being abused by his father and had reason to believe the complaints were true. However, defendants did not act to remove plaintiff from his father's custody. Plaintiff claimed that defendants' failure to act deprived him of his liberty in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Supreme Court upheld a summary judgment in favor of defendants.

The Court explained that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195, 109 S.Ct. at 1003. Continuing, the Court said:

> If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*Id.* at 196–97, 109 S.Ct. at 1003–04. The Court rejected an argument that certain "special relationships" [created through incarceration or involuntary commitment to mental institutions] impose an affirmative state obligation to provide the public with adequate protective services. The Court answered the argument saying that "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering

the protections of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means." *Id.* at 200, 109 S.Ct. at 1006.

We recognize the factual difference between *DeShaney* and the instant case in that Abigail died in the care of foster parents, as opposed to receiving injuries by the hand of an abusive parent. However, *DeShaney* was applied and followed in *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459 (3d Cir.1990), under facts strikingly similar to the instant case.

The plaintiffs in *Fialkowski* were the parents of Walter, their profoundly retarded adult son. He suffered from an eating disorder known as food shovelling which required his caregivers to exercise special precautions to prevent him from choking. While in the care of one of the defendants (Greenwich) Walter choked to death after apparently stuffing two peanut butter sandwiches in his mouth.

Plaintiffs brought an action under 42 U.S.C. § 1983 (and a state tort claim) against state and local mental health officials, a nonprofit organization responsible for making living arrangements for Walter, Greenwich and one of its employees. The court of appeals upheld the district court's grant of a summary judgment in favor of the latter three defendants based on *DeShaney* because the defendants owed no constitutional duty to protect a person not in involuntary custody. 921 F.2d at 461.

The Pennsylvania statutory scheme, regarding the care and placement of mentally retarded persons, carefully described in *Fialkowski*, is similar to chapters 630 and 633. Both states have made provisions for the placement of mentally retarded persons with the assistance of the state. Section 630.605 provides for such placement in accordance with an individual's IHP in a facility either funded or maintained by the Department of Health. A minor client, like Abigail, cannot be placed without a parent's consent. § 630.625. Under § 633.105, a regional center established by the Department of Health is responsible, upon request, for securing comprehensive mental retardation services for clients of the Department.

Section 633.110 requires a regional center to involve a client's family, like Plaintiff, in decisions affecting the client's care, habilitation, and placement. A resident of a mental retardation facility shall be discharged immediately when a person like Plaintiff requests the release. § 633.125.

A comparison of the Missouri and Pennsylvania statutes covering this subject indicates each state's willingness, when requested, to assist parents of developmentally disabled or mentally retarded children like Abigail.

In light of the Pennsylvania statutory scheme, the *Fialkowski* court determined that Walter was not "deprived of freedom 'through incarceration, institutionalization or other similar restraint of personal liberty.' *DeShaney*, [489 U.S. at 189], 109 S.Ct. at 998." *Id.* at 466. The court came to this conclusion because the state did not substantially curtail Walter's personal liberty. His parents voluntarily placed him in the Greenwich home and were free to remove him if they so desired. *Id.* at 465.

Like Walter's parents, the instant Plaintiff requested state services for Abigail, voluntarily consented to her placement in foster care, had the opportunity to involve herself in decision making regarding Abigail's care and placement and could have removed her at any time from foster care. As a result, Springer and Powers owed no constitutional duty to protect Abigail who was not in involuntary custody.

Plaintiff's reliance on *Norfleet v. Arkansas Dep't of Human Services*, 989 F.2d 289 (8th Cir.1993), is misplaced because of a significant factual difference from the instant case. In *Norfleet*, the child who died in foster care was removed from the mother's custody without her consent by the Arkansas Department of Human Services, and one of its case workers placed the child in a foster home operated for the state. The child's mother commenced an action under 42 U.S.C. § 1983.

The favorable result to plaintiff in *Norfleet* resulted from the custodial relationship "created by the state when it took [the child] from his caregiver and placed him in foster care." *Id.* at 293. In contrast, Abigail was not removed from her mother's custody by the state. Her foster care placement was voluntarily initiated by her mother who continued to have decision-making rights regarding Abigail's care and placement, along with the right to remove her from foster care. Because of this difference, we find *Norfleet* unpersuasive and conclude that the trial court properly dismissed Count II.

Judgment affirmed.

GARRISON and BARNEY, JJ., concur.