Simeon BRAGADO, Sr., individually and as Independent Administrator of the Estate of Judith Bragado, deceased, Plaintiff,

v.

CITY OF ZION/POLICE DEPARTMENT, an Illinois Municipal Corporation; Sergeant Morrison, individually and in his official capacity as a sergeant with the City of Zion/Police Department; Robert Levanowich, individually and in his official capacity as a police officer with the City of Zion/Police Department; Don Williamson, individually and in his official capacity as a police officer with the City of Zion/Police Department; and Cheryl Cosey, individually and in her official capacity with the City of Zion/Police Department, Defendants.

No. 89 C 2409.

United States District Court, N.D. Illinois, E.D.

April 6, 1992.

James Edward Pancratz, James E. Pancratz, Ltd., Chicago, Ill., for plaintiff.

Gregory E. Rogus, Paul E. Wojcicki, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, Ill., for defendants.

## ORDER

NORGLE, District Judge.

Before the court is the defendants' motion for summary judgment. For the following reasons, the motion is denied.

---

1. The facts set forth herein were drawn from the parties respective statements of fact filed pursuant to Local Rules 12(m) and 12(n), and unless otherwise noted, are uncontradicted.

## FACTS

This case arose from the suicide of Judith Bragado ("Bragado") in the early morning hours of March 31, 1988 while she was being held in a jail cell at the Zion, Illinois police station.[1] She had been arrested for disorderly conduct the prior evening near the Zion home of her former boyfriend, Ed DeLara ("DeLara").

Two months earlier, on January 23, 1988, Zion police received a report at 1:54 p.m. of a suicide attempt or possible overdose by Bragado at DeLara's home, where Bragado and DeLara were living together. Police officers David Parker ("Parker") and defendant Robert Levanowich ("Levanowich") answered the call and found Bragado and DeLara wrestling on the kitchen floor. DeLara told the officers that he broke up with Bragado and gave her two weeks to move, whereupon she threatened to kill herself by overdosing on butalbital[2] pills prescribed to her. According to Parker's police report and Levanowich's deposition, Bragado was upset at the short removal deadline but denied making a suicide attempt and said she had flushed the pills down a toilet.

That evening at 6:38 p.m., Zion police were called back to DeLara's home regarding a possible overdose by Bragado, according to a report by police officer Wayne Brooks. DeLara had earlier asked his brother, Ron DeLara, and Ron DeLara's roommate, Michael Hudnall, to come to the home to help with Bragado. DeLara and Hudnall told Brooks that Bragado had taken four or five butalbital pills. A squad of paramedics and officer Brooks found a semi-coherent Bragado in an upstairs bedroom. Bragado refused treatment and signed a release. She also claimed to be drunk and again said she had flushed the pills down a toilet.

The police and paramedics left, but the police were called for the third time back to the house at 7:37 p.m. following a report

---

2. Butalbital is "a barbiturate of intermediate duration of action; sedative and hypnotic." *Stedman's Medical Dictionary* 204 (Fifth Unabridged Lawyers' Ed., Anderson Pub. Co. 1982).

that Bragado had threatened Hudnall and Ron DeLara with a gun. Several officers including Brooks answered the call. Hudnall and Ron DeLara said that Bragado waved a gun at them and threatened to kill the two DeLaras, Hudnall and herself. Bragado denied that the incident occurred. She was arrested and charged with two counts of aggravated assault, and a .22 caliber revolver was recovered. Officer Brooks contacted the Lake County Mental Health Department and Old Orchard Hospital in Skokie, and considered taking Bragado to St. Therese Hospital in Waukegan on an involuntary petition. Bragado was also asked whether she would voluntarily submit to a psychiatric evaluation. She said she had received psychiatric treatment in the past and might seek such help in the future. Bragado was then released on bond to two of her sisters.

On March 30, 1988, while on patrol, officer Levanowich was twice sent to the area of DeLara's house. The first time was at 5:32 p.m. following a report of a suspicious person, who turned out to be Bragado, sitting in a car on DeLara's block. Bragado told the officer that she was thinking and that she was going to walk through a nearby park. Levanowich noticed a pair of small cuts on Bragado's wrists, which appeared minor and were not bleeding. Bragado, who appeared alert and behaved normally, said she suffered the cuts on her wrists on her job at the Great Lakes Naval Base. In response to repeated questions from Levanowich, Bragado said she did not need any help or anyone with whom she could talk. She then left the area.

Later, at 7:32 p.m., Levanowich was sent back to the area, again finding Bragado sitting in a car. Bragado appeared to be very drunk and sleepy, and Levanowich found five or six empty wine cooler bottles on the grass near the car.[3] Bragado was verbally abusive toward both Levanowich and defendant officer Don Williamson ("Williamson"), who soon arrived on the scene. Williamson noticed the small cuts on Bragado's wrists. The officers arrested Bragado for disorderly conduct and placed her in a squad car, which Levanowich drove to the Zion police station.

Bragado had left in DeLara's mailbox a blood-stained, handwritten note (attached as Exhibit A), which stated in part: "Ed I will always Love My Life is Over now.... Love Judy." Levanowich either retrieved the note or had someone else do so. He read the note shortly after arriving at the police station with Bragado. Levanowich did not consider it a suicide note because it did not specifically state that Bragado would kill herself.

Nonetheless, Levanowich was concerned about the note and discussed it, as well as previous incidents involving Bragado, with the shift commander, defendant Sergeant Morrison ("Morrison").[4] Levanowich then called the Lake County assistant state's attorney on call, John Kornak, for advice. Kornak, after consulting the law and a victim's assistance counselor in the state's attorney's office, suggested that Bragado either be taken to St. Therese Hospital or held until morning bond court, when the state could request that Bragado be required to seek help as a condition of bond. The police decided to book Bragado for disorderly conduct and hold her.

During the post-arrest booking process, Bragado was allowed to use a telephone between 7:30 and 9:00 p.m.[5] and made sev-

---

3. Levanowich's arrest report states that he found "numerous" wine cooler bottles. During a post-suicide internal investigation, Levanowich estimated that there were five to six bottles. At his deposition, however, Levanowich said he found only three or four bottles. Under all the circumstances, the discrepancy over the number of bottles does not create a genuine issue of material fact.

4. Morrison had participated in the police response to Bragado's alleged January 23, 1988 aggravated assault of Michael Hudnall and Ron

DeLara. After Hudnall and Ron DeLara left Ed DeLara's house to call the police, Morrison called the house to persuade Bragado to come to the front door.

5. Bragado's estate contends that Bragado could not effectively use the phone "due to her physical and mental status," and offers in support the affidavit of Peter Chhabria, a physician who treated Bragado for migraine headaches among other conditions. Chhabria asserts that quantities of the drugs Inderal and Fiorinal, which he prescribed for Bragado a week prior to her

eral calls. Levanowich helped Bragado find some numbers in a phone book, including the number of an attorney she named. Bragado did not reach anyone, but left messages on answering machines. Before placing Bragado in a cell at roughly 9:00 p.m., Levanowich asked if she wanted professional help or someone to talk to, but she declined the offer in a combative manner. She remained coherent, however, and in no apparent physical danger.

Two of Bragado's sisters, Sharon Rich and Anita Learsch, upon learning of Bragado's failure to report for work that evening, together called the Zion Police Department sometime between 8:45 and 9:30 p.m. Both spoke with Morrison, while Rich also spoke with Williamson. The sisters expressed concern that Bragado was suicidal and for possible complications from Bragado's prescription pills, and also asked the officers how to obtain Bragado's release. Learsch testified at deposition that she told Morrison that Bragado would kill herself if she was not released. Morrison told Learsch and Rich that he was aware of Bragado's allegedly suicidal condition based on her note to DeLara, the cuts on her wrists, and the previous incidents involving her. According to Learsch, Morrison also said Bragado would be held overnight because she was suicidal, and would be monitored carefully. Morrison, at his deposition, only recalled providing standard bond information to Bragado's sisters.

Levanowich and Williamson went off duty around 11:00 p.m. Before Morrison left the police station around 11:30 p.m., he informed the next shift commander, Sergeant Edward Bridges, that Bragado was being held. Morrison said that Bragado was drinking, that police reports and other information was available on her, and that the state's attorney's offices had been contacted. Morrison also told Bridges of Bragado's purported suicide note and that she had cuts on her wrists.

Officers Billy Roland ("Roland") and Larry Holmgren ("Holmgren") and defendant dispatcher Cheryl Cosey ("Cosey") came on duty around 11:00 p.m. Holmgren, who worked the radio room with Cosey, remained on duty until around 2:00 a.m. on March 31, 1988. A prisoner check card indicates that Bragado was checked at 11:15 p.m., 11:46 p.m., 12:19 a.m., and 1:51 a.m. Holmgren made most of those checks. After Holmgren left, Cosey worked the radio room alone and was the only police employee present in the station with Bragado during most of the remaining time before Bragado's suicide. Sergeant Bridges and officer Roland were out on patrol.

The jail cells in the Zion police station were a two- to three-minute walk down a hallway from the radio room. The police radio could not be heard from the cell area. A monitoring system enabled Cosey, from the radio room, to hear noises in the cell area and to view the fronts of the cells, but Cosey could not visually monitor the insides of the cells on the system. Bragado was the only prisoner held at the station on the evening of March 30, 1988.

Cosey heard Bragado yelling and shouting profanities through much of the night, repeatedly saying that she wanted to be released and that she wanted to call an attorney. Bragado also said several times that she was going to hang herself, which prompted Cosey to call in Roland at least once to check on Bragado. Roland did so at 4:42 a.m. and reported back to Cosey that Bragado was all right. Cosey never checked Bragado personally; Cosey's primary duties were to work the radio room. During Cosey's tenure with the police department, she had previously had prisoners threaten to kill themselves, but none had actually done so.

Roland, during the 4:42 check, observed Bragado breathing, clothed and lying down, apparently asleep. Around 6:00 or 6:30 a.m., Cosey radioed Roland to pick up

death, "probably existed" in her system when she was arrested and caused her mental and physical problems. The affidavit is not based on any personal knowledge of Bragado's condition at the time of her death and its value is

highly questionable. Nonetheless, Chhabria's affidavit is insufficient to create a genuine issue of material fact regarding either the police's knowledge of Bragado's condition at arrest or their response to that condition.

breakfast for Bragado. Roland returned to the station with the breakfast and proceeded to the cell area with Cosey at 7:14 a.m., whereupon they found Bragado hanging by her tank top from the cell bars. Paramedics were immediately called, but upon arrival, they found that Bragado evinced no vital signs.

Zion Police Department Regulation 13.22 provides that arresting officers or others responsible for prisoners "shall take any person in their custody before competent medical authority whenever there is any visible or reasonable evidence of the need for medical attention or where the prisoner claims that he is in need of such attention." The Illinois Municipal Jail and Lockup Standards provide that personal inspections of prisoners, not including observations over monitoring devices, must be conducted at least once every hour, with the time of the checks and identity of the checkers recorded. The Lockup Standards further provide that prisoners who appear to suffer from a mental disorder, or who have a known history of mental disorders or defects, "shall be afforded protective custody and constant supervision until transferred" to an appropriate facility.

Simeon Bragado, Sr., Bragado's estranged husband, filed the instant lawsuit on March 23, 1989 on behalf of himself and Bragado's estate.[6] He filed an amended complaint on December 6, 1991.[7] Count I of the amended complaint alleged that Bragado's rights under the Eighth and Fourteenth Amendments, actionable under 42 U.S.C. § 1983, were violated as a result of the defendants' alleged failure to prevent Bragado's suicide, to provide Bragado with prompt medical care and self-protection, and to reasonably monitor Bragado while in custody. Counts II and III raise claims respectively under the Illinois Survival Act, Ill.Rev.Stat. ch. 110½, ¶ 27–6 (1989) (mis-

cited in plaintiff's complaint as ch. 3, ¶ 339), and the Illinois Wrongful Death Act, Ill. Rev.Stat. ch. 70, ¶ ¶ 1, 2 (1989).

## DISCUSSION

 Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute about a material fact is "genuine" if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A plaintiff cannot rest on mere allegations of a claim without any significant probative evidence in support. *Id.* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Accordingly, the non-moving party must go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. A "scintilla of evidence" is insufficient; the non-movant must offer evidence on which a jury could reasonably find for him. *Brownell v. Figel,* 950 F.2d 1285, 1289 (7th Cir.1991). Nevertheless, in deciding whether any genuine issues of material fact exist, the court must draw all reasonable inferences in the light most favorable to the non-movant. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

**6.** This court previously dismissed plaintiff's claim in the first complaint that Bragado's Fourth Amendment right to a prompt probable cause hearing was violated. *Bragado v. City of Zion/Police Dept.,* No. 89 C 2409, slip op. at 9–11 (N.D.Ill. June 22, 1990).

**7.** Defendants' motion for summary judgment was filed December 6, 1991, the same day plain-

tiff was granted leave to file his amended complaint. Plaintiff filed his brief in opposition to summary judgment and related material on January 24, 1992, and defendants' reply brief was filed on February 14, 1992. Under the circumstances, the court deems it fair and appropriate to apply to defendants' motion to the amended complaint.

■ Regarding Count I, both the plaintiff and the defendants agree that the defendants' alleged constitutional violations are governed by the "deliberate indifference" standard. *See Salazar v. City of Chicago*, 940 F.2d 233, 238–41 (7th Cir. 1991) ("deliberate indifference" standard applies to alleged violations of pretrial detainees' right to medical treatment under either the Eighth or Fourteenth Amendments). The parties disagree on whether the defendants were in fact "deliberately indifferent" to the risk of Bragado's suicide. The defendants maintain that the plaintiff has failed to offer facts showing the requisite "deliberate indifference" on their part. They alternatively argue that even if they failed to take adequate steps to prevent Bragado's suicide or to protect her, they are entitled to qualified immunity because it was not clearly established at the time of Bragado's suicide that additional precautions were constitutionally required to prevent prisoner suicides. *See Anderson v. Creighton,* 483 U.S. 635, 638–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (discussing general applicability of qualified immunity to governmental officials' conduct).

The Seventh Circuit recently answered the qualified immunity question in the plaintiff's favor in a case with similar facts to this case. *Hall v. Ryan*, 957 F.2d 402 (7th Cir.1992). That case effectively governs both aspects of the "deliberate indifference" issue here—whether the defendants' suicide precautions were inadequate, and whether it was clearly established to be inadequate at the time—and requires that summary judgment be denied as to Count I.

In *Hall,* a man with a history of suicide attempts hanged himself by his undershorts, from which he "remains in a permanent comatose state," approximately 30 minutes after he was placed in a jail cell by Decatur, Illinois police. *Id.,* at 403–04. The man had 28 prior arrests in Decatur over 14 years, and had been placed in a Decatur holding cell nine prior times. *Id.* at 403–04. Approximately nine months before the suicide attempt, the man was arrested while armed with a gun and threatening suicide, and was taken directly to a hospital. *Id.* at 403. The police report of that arrest stated that the man had attempted suicide several times. *Id.* After that arrest, and a few months before the suicide attempt, members of the man's family allegedly met with the Decatur police chief to advise him of the man's suicidal condition. *Id.* Nonetheless, the Decatur police allegedly failed to offer the man any psychiatric help after his final arrest and took no steps to maintain observation of the man after placing him in a holding cell. *Id.* at 403. The man was uncooperative upon arrest, and behaved belligerently and strangely both during the booking process and in the cell. *Id.*

The Seventh Circuit upheld the district court's denial of summary judgment for the defendants, four Decatur police officers, based on findings that there was sufficient evidence of "deliberate indifference" and that qualified immunity was inapplicable. *Id.* at 406. A key factor was evidence of the defendants' alleged knowledge of the suicide risk. *Id.* at 405–06.

Many of the same factual elements are present in this case. Police reports of the two incidents on January 23, 1988 involving Bragado include statements by her former boyfriend, DeLara, and others that Bragado threatened to commit suicide and may have attempted to do so. When she was arrested on March 30, 1988, she had cuts on her wrists and had just written a note to DeLara stating her "life is over now." The police were clearly aware of both the cuts and the note. Bragado's sisters claim that they told the police on the night of the arrest that Bragado was suicidal. Additionally, Bragado threatened to commit suicide repeatedly while she was in her cell. The police consultation with the Lake County State's Attorney's office and the decision to hold Bragado overnight, apparently for her own safety, also suggest that the police considered her suicidal.

Moreover, the plaintiff has proffered evidence that arguably shows "deliberate indifference" on the defendants' part. The Illinois Municipal Jail and Lockup Standards specifically provide that detainees

with known mental disorders or defects, or who appear to suffer from such a disorder or defect, can only be held temporarily in a municipal jail, must be transferred to an appropriate facility as soon as possible, must be afforded individualized supervision, and must be referred for immediate "professional study and diagnosis." *See id.* at 403 n. 5 (quoting the Lockup Standards). As discussed above, there is substantial evidence that Bragado suffered from psychological problems of which the Zion police were aware, or should have been aware. There is some evidence that police personnel made inquiries regarding possible transfer of Bragado or for psychological evaluation of her, and that they asked her if she wanted professional help. The adequacy of those inquiries is arguable, however, and it is undisputed that Bragado was not transferred and was not professionally evaluated after her March 30, 1988 arrest. More significantly, the defendants concede that Bragado was not constantly supervised.

The legal force of the Illinois Municipal Jail and Lockup Standards, and the defendants' knowledge and understanding of those standards, are unclear. Nonetheless, it is undisputed that several aspects of the Lockup Standards were violated. These violations arguably show "deliberate indifference" or recklessness amounting to such indifference. *See McGill v. Duckworth,* 944 F.2d 344, 347–48 (7th Cir.1991) (defining recklessness in this context), *cert. denied,* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Holmes v. Sheahan,* 930 F.2d 1196, 1199–1200 (7th Cir.) (discussing when failure to provide medical care for pretrial detainee may constitute deliberate indifference), *cert. denied,* —— U.S. ——, 112 S.Ct. 423, 116 L.Ed.2d 443 (1991).

Therefore, there are genuine issues of material fact regarding both the defendants' actual or constructive knowledge of Bragado's suicidal condition and whether their response to that condition constituted "deliberate indifference." Additionally, it was clearly established at the time of Bragado's March 30, 1988 arrest that the "deliberate indifference" standard applied to the handling of suicidal pretrial detainees, and that failure to take special precautions toward such detainees could violate that standard. *See Hall* at 404 (no qualified immunity regarding arrest on May 4, 1986). Consequently, the defendants' motion for summary judgment on Count I is denied.

Moving on to the two state claims, Counts II and III, the defendants contend that they are entitled to summary judgment on these claims under a provision in the Illinois Local Government and Governmental Employees Tort Immunity Act, Ill. Rev.Stat. ch. 85, ¶ 4–105. That provision states that local governmental employees cannot be held liable for failing to provide medical care to prisoners unless that failure was the result of "willful and wanton conduct." *Id.* The term "willful and wanton" is defined in the Act as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *Id.,* ¶ 1–210. The Illinois Supreme Court has further defined "willful and wanton" conduct as being "intentional or ... committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness, or carelessness when it could have been discovered by ordinary care." *Lynch v. Board of Educ.,* 82 Ill.2d 415, 429, 45 Ill.Dec. 96, 106, 412 N.E.2d 447, 457 (1980).

Under Illinois law, whether certain conduct is "willful and wanton" is normally a question of fact for the fact-finder to decide, although the court must first decide as a matter of law that sufficient evidence has been presented on the issue. *Brown v. Chicago Park Dist.,* 220 Ill. App.3d 940, 943, 163 Ill.Dec. 404, 407, 581 N.E.2d 355, 358 (1st Dist.1991). The definitions of "willful and wanton" in both the Illinois Local Government Immunity Act and in *Lynch* are essentially the same as the definition of "deliberate indifference" under federal constitutional law. The

plaintiff here has proffered sufficient facts to create a material issue of fact regarding the "willful and wanton" issue for the reasons discussed above concerning "deliberate indifference."

■ The defendants did not raise any additional arguments concerning the state claims, and therefore, summary judgment is denied as to Counts II and III. The court simply notes in reference to Count II, the Survival Act count, that the Survival Act merely preserves certain causes of actions which accrued to a decedent before their death, and does not create a cause of action. *Wyness v. Armstrong World Indus., Inc.*, 131 Ill.2d 403, 410–11, 137 Ill. Dec. 623, 626, 546 N.E.2d 568, 571 (1989). Count II does not list any statutory or common law basis other than the Survival Act, but nonetheless appears to adequately plead a common law negligence claim and the court construes it as such a claim.

### CONCLUSION

The defendants' motion for summary judgment is denied in its entirety.

IT IS SO ORDERED.

EXHIBIT A