The **ESTATE OF Frank Bernard CASSARA**, by its special administrator, Michael J. CASSARA, Plaintiffs,

v.

**STATE OF ILLINOIS, Abdul Basit,** individually, and as Facility Director; Judith Cast, individually and as an employee of the Defendant, State of Illinois; Paul Jackson, individually and as an employee of the Defendant, State of Illinois; Emma Turner, individually and as an employee of the Defendant, State of Illinois; and Other Unknown Employees, individually and as employees of the Defendant, State of Illinois, Defendants.

No. 93 C 5076.

United States District Court, N.D. Illinois, Eastern Division.

May 19, 1994.

Mark A. Sikora, Rittenberg & Buffen, Ltd., Chicago, IL, for executor plaintiff Michael J. Cassara.

Kathleen Kreisel Flahaven, Daniel P. Fitzgerald, IL Atty. Gen. Office, Chicago, IL, for defendants State of IL, Abdul Basit.

Harry B. Bainbridge, Bainbridge Law Offices, Flossmoor, IL, for defendant Judith Cast.

Steven Spencer Brown, Royal B. Martin, Jr., William Gibbs Sullivan, Martin, Brown & Sullivan, Ltd., Chicago, IL, for defendants Paul Jackson and Emma Turner.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court are the motions of defendants Paul Jackson, Emma Turner, and Judith Cast (collectively "defendants") to dismiss plaintiff's complaint. For the reasons set forth below, the motions are denied in part and granted in part.

## FACTS

On February 19, 1993, Frank Bernard Cassara ("Cassara") was taken by ambulance to Christ Community Hospital for evaluation after he requested emergency assistance. Cassara was subsequently restrained and transferred to the Tinley Park Mental Health Center ("Mental Health Center") after he evinced suicidal behavior. Cassara voluntarily committed himself into the Mental Health Center and requested treatment pursuant to the Illinois Mental Health Developmental Disabilities Act, 405 ILCS 5/3–400. The Mental Health Center is a state-operated medical institution created under the laws of Illinois. Defendants are members of the staff of the Mental Health Center and are state employees.

At the Mental Health Center, Cassara was placed on suicide precautions watch. After becoming aggressive and confrontational with the staff and other patients, Cassara was placed in a restraint/seclusion room for close observation. Pursuant to statute, seclusion is used only as a therapeutic measure to prevent a recipient from causing physical harm to himself or physical abuse to others. 405 ILCS 5/2–109. Seclusion is employed only upon written order of a physician. *Id.* Moreover, a qualified person must observe the person placed in seclusion at all times. *Id.*

On February 22, 1993, Cassara was found dead in the restraint/seclusion room, having taken his life by strangulation. Plaintiff alleges that defendants failed to observe Cassara, or failed to prevent him from harming himself during his extended period of time in seclusion. The staff at the Mental Health Center also failed to expropriate the items Cassara eventually utilized in implementing his suicide: a comb and pair of socks.

Plaintiff is the special administrator of the Estate of Cassara. Plaintiff brought this suit pursuant to 42 U.S.C. § 1983 and under state law alleging that defendants took affirmative actions which permitted the death of Cassara, or failed to follow or enforce policies which would have prevented the death of Cassara, in violation of the Fourteenth Amendment. The court has dismissed the State of Illinois from this suit and has dismissed the Facility Director of the Mental Health Center, Abdul Basit. *See* 843 F.Supp. 411 (N.D.Ill.1994).

On February 11, 1994, defendants Jackson and Turner filed a joint motion to dismiss, asserting that plaintiff's complaint fails to state a claim for which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendant Cast did the same on February 25, 1994. In regard to the § 1983 claims, defendants maintain that plaintiff fails to allege a constitutional violation and that, in any event, they enjoy qualified immunity for their actions. Defendants further maintain that the state claims should be dismissed because plaintiff failed to meet the requirements under Illinois law for a healing art malpractice case and because plaintiff failed to allege that Cassara experienced conscious pain and suffering prior to his death.

## DISCUSSION

■■■ On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations of the complaint, as well as all reasonable inferences drawn therefrom, are accepted as true. *Stephenson v. Stone,* 21 F.3d 159, 161 (7th Cir.1994). Because federal courts simply require "notice pleading," this court must construe pleadings liberally. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* — U.S. —, —, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). A complaint's mere vagueness or lack of detail is not sufficient to justify a dismissal. *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985). Furthermore, the ambiguities in a complaint are resolved favorable to plaintiffs, not defendants. *Canedy v. Boardman,* 16 F.3d 183, 188 (7th Cir.1994). The complaint, however, must state either direct or inferential allegations concerning all material elements necessary for recovery under the relevant legal theory. *Mescall v. Burrus,* 603 F.2d 1266, 1269 (7th Cir.1979). Accordingly, a party fails to state a claim upon which relief may be granted only if that party can prove no set of facts upon which to grant legal relief. *Ross v. Creighton Univ.,* 957 F.2d 410, 413 (7th Cir.1992).

To establish liability under § 1983, plaintiff must show that defendants acted under the color of state law and deprived Cassara of a federal right. 42 U.S.C. § 1983. Defendants essentially maintain that plaintiff has failed to allege a violation of a federal constitutional right. More specifically, defendants claim that there is no basis for plaintiff to claim Cassara was deprived of his due process rights during his stay at the Mental Health Center because Cassara was a voluntary patient. As a person voluntarily restrained by state actors, Cassara's due process rights are not implicated.

■■■ The Due Process Clause of the Fourteenth Amendment, upon which plaintiff relies as the source of Cassara's federal right, provides that "no state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. While the Fourteenth Amendment forbids the state itself to deprive individuals of life, liberty, or property without due process of law, the amendment does not compel a state to protect its citizens' life, liberty, or property from encroachment by private actors. *DeShaney v. Winnebago County. Dept. of Social Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). Accordingly, a general right to governmental aid does not arise from the due process clauses contained in either the Fifth or Fourteenth Amendment, even if such aid were necessary to secure an individual's life, liberty and property. *Id.* at 196, 109 S.Ct. at 1003; *Harris v. McRae,* 448 U.S. 297, 317, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980).

■■■ Although the state has no general duty under the Due Process Clause to protect individuals, it is required to provide conditions of reasonable care and safety to patients who are involuntarily committed into a state mental health facility. *Youngberg v. Romeo,* 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982); *see also City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (deliberate indifference by officials to serious medical need or injury of pretrial detainee constitutes punishment without due process). This duty encompasses the prevention of suicides by those in a state or municipality's custody. *See, e.g., Bragado v. City of Zion/Police Dep't,* 788 F.Supp. 366, 371 (N.D.Ill.1992). The duty, however, arises only when the State affirmatively exercises its power and restrains an individual's liberty so that he is unable to care for himself. *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459. The affirmative duty to protect arises not from the State's knowledge of an individual's problem, but arises from the limitation which the State has imposed on the individual's ability to act on his or her own behalf. *DeShaney,* 489 U.S. at 195, 109 S.Ct. at 1003.

■■■ In this case, however, Cassara voluntarily admitted himself into the Tinley Park Mental Health Center. Defendants thus assert that the due process clause is not implicated because Cassara's liberty was not restrained—or at least not involuntarily restrained. Defendants point out that, under

Illinois law, Cassara was free to request his discharge from the facility at any time, including while placed in the restraint/seclusion room. *See* 405 ILCS 5/3–401(b) and 5/3–403. Plaintiff, on the other hand, asserts that despite the lack of a formal involuntary commitment, Cassara's liberty interests were restricted to such a degree that due process protection is warranted. Plaintiff maintains that the restraint of Cassara was the functional equivalent of being held in custody.

The court agrees that, on this motion to dismiss, there may be some set of facts which would entitle plaintiff to relief. The court is not willing to set a *per se* rule that all individuals who are voluntarily committed into a state institution have no rights under the Due Process Clause of the Fourteenth Amendment—that their liberty or property interests are not implicated, or protected from governmental intrusion, as a matter of law. The voluntary nature of a person's confinement is relevant to determining the process due the individual, i.e., the level of care required of the state officials, or the nature and scope of the state's control over the patient. Yet in this case, based on the pleadings, there may exist a special relationship between Cassara and the state that was created by the state's restraint of Cassara through Cassara's voluntary commitment.

The court must first confine its analysis within the bounds of *Youngberg* and *DeShaney*. In *Youngberg*, the United States Supreme Court considered for the first time the due process rights of involuntarily committed mentally retarded persons. In upholding the due process rights of the involuntarily committed patient, the Court initially emphasized that, merely because a patient is committed under proper procedures, he does not lose all substantive liberty interests under the Fourteenth Amendment. *Youngberg*, 457 U.S. at 315, 102 S.Ct. at 2457–58. The Court specifically recognized that the rights to safe conditions and freedom from bodily restraint survive involuntary commitment proceedings. *Id.* at 315–16, 102 S.Ct. at 2457–58.

As recognized in *DeShaney*, however, the important factor of *Youngberg* for triggering the duty on state officials is the state's affirmative restraint of an individual's freedom.

*DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006. Yet *Youngberg* recognized that the important, historical liberty interests protected substantively by the due process clause are not extinguished by lawful confinement, whether the confinement is for penal purposes or not. *Youngberg*, 457 U.S. at 315, 102 S.Ct. at 2457–58. The state's institutionalization of a person creates the duty to provide certain services and care, even though the state possesses discretion in determining the nature and scope of its responsibilities, because the institutionalized person is now wholly dependent on the state for his or her care. *Id.* at 317, 102 S.Ct. at 2459. Instructive to this case is the *Youngberg* Court's dicta at the end of its opinion: "The State ... has the unquestioned duty to provide reasonable safety for *all residents and personnel* within the institution. And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training." *Id.* at 324, 102 S.Ct. at 2462 (emphasis added). Therefore, involuntarily committed patients "enjoy[ ] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests. Such conditions of confinement would comport fully with the purpose of respondent's commitment." *Id.*

Thus *Youngberg* did not foreclose recognition of the due process rights of voluntarily committed patients. And consistent with the logic of *Youngberg*, a voluntarily committed patient's liberty interests under the Fourteenth Amendment are no less extinguished by that person's commitment into a mental health center as are the rights of an involuntarily committed individual.

In *DeShaney*, however, the petitioners had contended that a special relationship was created or assumed by the state in that case because the state knew of the special danger facing a young boy from his father's abuse, and that the state proclaimed specifically its intention to protect him against that danger. *DeShaney*, 489 U.S. at 197, 109 S.Ct. at 1004. In rejecting the petitioners' argument, the Court stated,

[*Estelle v. Gamble*, 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976) and *Youngberg* ] afford petitioners no help. Taken together, they stand only for the proposition that when the State takes a person into its custody and holds him there *against his will*, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State *by affirmative exercise of its power* so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.q.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the [due process clause]. *Id.* at 199–200, 109 S.Ct. at 1005–1006 (emphasis added; citations and footnotes omitted). The affirmative duty to protect arises only from the limitations the state has imposed on an individuals freedom to act on his own behalf. *Id.* at 200, 109 S.Ct. at 1006. Thus defendants read *DeShaney* to suggest that a state's affirmative exercise of power may only come about against the patient's will—or involuntarily.

Defendants find further support for their position in *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987 (1st Cir.1992). In *Monahan*, as in Cassara's case, the court was faced with a situation that fell within the grey area between *Youngberg*, and *DeShaney:* while the plaintiff was not involuntarily committed, he did live for six days in a facility administered by, or on behalf of, the State of Massachusetts. *Id.* at 990. In that case, however, the plaintiff was injured when he jumped from a moving van that was transporting him back to his residence at a group home for the mentally ill. The First Circuit found the plaintiff's relationship to the state closer to that of the plaintiff in *DeShaney* than in *Youngberg. Id.* The court observed that the plaintiff voluntarily committed himself to the care of the state facility. Thus, "[b]ecause the state did not commit [the plaintiff] involuntarily, it did not take an 'affirmative act' of restraining his liberty, an act which may trigger a corresponding due process duty to assume a special responsibili-

ty for his protection." *Id.* at 991. In rejecting plaintiff's factual distinctions, the court emphasized that no special relationship arises if the state has not restrained the person's liberty, rendering him unable to care for himself. *Id.* The plaintiff in *Monahan* was not being held against his will and the state had not used its sovereign power to render him unable to care for himself. *Id.*

Prior to *Monahan* and *DeShaney*, the First Circuit in *Harper v. Cserr*, 544 F.2d 1121 (1st Cir.1976) had speculated that a voluntarily committed patient, though lacking formal commitment, could be a *de facto* ward of the state, depending upon the patient's degree of disability and the availability of other resources. *Id.* at 1123. Under certain circumstances, then, the voluntary patient may be under a compulsion to endure the conditions at the facility. *Id.* Other federal courts opined similarly. *See, e.g., Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1246 (2d Cir.1984); *Goodman v. Parwatikar*, 570 F.2d 801, 804 (8th Cir.1978). Yet the *Monahan* court distinguished this line of cases because the plaintiff's helplessness in *Monahan* was not attributable to the state's custody, but was the patient's own mental condition alone that impinged upon his freedom to leave. The state did not restrain him. *Monahan*, 961 F.2d at 992.

Defendants also cite to *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459 (3d Cir.1990). In that case, the decedent was voluntarily transferred by his parents to a group home that was established by a statutory scheme in Pennsylvania. The defendant in that case was a non-profit organization under contract with the state, although its actions were governed by statutory regulations. *Id.* at 460. The facility, therefore, was operated by a private entity. *Id.* at 460–61. Although the Third Circuit did not rely upon that fact in its decision, which held that the voluntarily committed individual's due process rights were not implicated, this court finds that distinction important.

The above cases thus stand for the proposition that a state official's duty arises when the plaintiff is deprived of freedom, "through

incarceration, institutionalization *or other similar restraint of personal liberty." De-Shaney,* 489 U.S. at 200, 109 S.Ct. at 1004. Even in *DeShaney* the plaintiff was in the custody of his father at the time the harm was suffered, not in the custody of a state facility. *Id.* at 201, 109 S.Ct. at 1006. The plaintiff in *DeShaney* was not taken or accepted into custody, signed no agreements, was not restrained, was not put into a room designed to protect him from himself or from others, received no medication, and suffered from no apparent mental illness. Moreover, the United States Supreme Court has determined that procedural due process safeguards are available to voluntarily committed patients in order to protect unwarranted deprivations of liberty. *Zinermon v. Burch,* 494 U.S. 113, 130–32, 110 S.Ct. 975, 986–88, 108 L.Ed.2d 100 (1990). Thus, this court holds that voluntary institutionalization may involve a restraint of personal liberty sufficient to trigger the due process clause.

■ A mental health patient is under a unique limitation on his or her own freedom to act. *See, e.g., id.,* 494 U.S. at 134, 110 S.Ct. at 988 (questioning competency of mentally ill patient's ability to truly exercise freedom to leave a residential care facility). When an individual signs into a mental health facility run by the state, that patient may be consenting to treatment, but the patient is also being committed under the control of the state. The state may restrict the patient's freedom to act, although the patient volunteered for this treatment. The nature of the discretion afforded state officials may be extensive because of the patient's voluntary act, but the court is not convinced that the discretion of state officials is wide enough to sanction the deliberate indifference to the patient's medical needs, or the patient's right to safe conditions, while the patient is incapacitated or restrained in the mental health facility.

■ In this case, Cassara was restrained by personnel at the Christ Community Hospital prior to being transported to the Mental Health Center. The complaint is silent as to who made the decision to take Cassara to the Mental Health Center. That trip may itself have been an involuntary (albeit legal) re-straint on Cassara. Nonetheless, the complaint establishes only that Cassara was placed under the care of the state facility and was restrained in a room designated for restraint and observation. By creating the Mental Health Center, the state has offered to take in persons who were in need of mental health services and to care for them. The Mental Health Center is certainly clothed with the authority of the state. *See, e.g., Spencer v. Lee,* 864 F.2d 1376, 1378–79 (7th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). Moreover, that Cassara was placed by the Mental Health Center's staff in a room that is used for restraining patients under guidelines established by state statute suggests a state restriction on liberty in a custodial, institutional setting. Although not specifically alleged, it is a reasonable inference to draw that Cassara may not have been free to leave the facility immediately if he had requested to do so. The court finds little practical difference between a locked jail cell and a locked restraint room under the circumstances alleged here. Although Cassara was purportedly free to leave at any time—even while in the restraint/seclusion room—it is not clear that he could merely walk out of the Mental Health Center without the state affirmatively consenting to or allowing his egress. Cassara may have had access figuratively to the key to his cell. The right to leave, however, does not guaranty the *power* to leave.

And as distinguished from *Monahan,* where the plaintiff argued that the state created, or at least rendered him more vulnerable to, the dangers that caused his injury, plaintiff here is not merely alleging that defendants created a dangerous condition. Plaintiff is alleging that while Cassara was under the custody and control of a state mental health facility, defendants, state employees of the facility, were deliberately indifferent to the suicidal tendencies of Cassara while they were acting pursuant to their statutory duties. The dangerous condition existed, and the state employees failed to remedy the problem while Cassara was unable to do so himself. It is thus not inconceivable that the state may, through its stat-

utory scheme or through the state official's exercise of discretion, render a voluntarily committed patient unable to care for himself or herself such that the state is charged with a duty not to infringe upon the due process rights of the patient. Accordingly, the court finds that the complaint states a claim under § 1983 and is not dismissed on this basis.

■ Defendants next claim they enjoy qualified immunity from the § 1983 suit for their actions. In order to penetrate defendants' shield of qualified immunity as government officials performing discretionary functions, plaintiff bears the burden of demonstrating that the defendants' conduct violated clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987). A right is clearly established when "the contours of the right [are] sufficiently clear that a reasonable official would understand that [the act in which he is engaging] violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, liability attaches if the unlawfulness of the official's act is objectively apparent given the pre-existing law at the time of the act. *Id.; Pounds v. Griepenstroh,* 970 F.2d 338, 340 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1256, 122 L.Ed.2d 654 (1993).

■ Plaintiff must show that Cassara's right was "sufficiently particularized" in regard to the precise facts facing defendants when they acted. *See McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992); *Landstrom v. Illinois Dep't of Children & Family Servs.,* 892 F.2d 670, 676 (7th Cir.1990). In other words, was the law as to the rights of a person in Cassara's position apparent "in relation to the specific facts confronting [defendants] when [they] acted"? *McDonald,* 966 F.2d at 293 (quoting *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988)); *Polenz v. Parrott,* 883 F.2d 551, 554 (7th Cir.1989). The court must examine all relevant precedents in evaluating defendants' qualified immunity. *Elder v.*

*Holloway,* — U.S. —, —, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994).

It is a clearly established right of an individual who is in state custody, whether for penal reasons or not, to be free from a state actor's deliberate indifference to that individual's serious medical needs. *Hall v. Ryan,* 957 F.2d 402, 404–05 (7th Cir.1992); *see also Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2457–58. But for the distinction defendants advance concerning the involuntary versus voluntary nature of a mental health patient's confinement, the actions in which plaintiff alleges defendants engaged would be actionable under § 1983. *See Hall,* 957 F.2d at 406. The duty of a state official not to be deliberately indifferent to the suicide risk of a confined individual is thus clearly established law. *See id.* at 404–05; *Bragado,* 788 F.Supp. at 372.

For the court to accept defendants' position, a state official could, with impunity from liability, permit all voluntarily committed patients to be used in uncontrolled, arbitrary medical experimentation and claim that their constitutional rights were not clearly established, yet at the same time know that directing the same actions toward an involuntarily committed person would be clearly illegal. The court's example, *reductio ad absurdum,* at least illustrates the point. From the standpoint of the victim to a constitutional deprivation, the right is clearly established. And the state officials are well apprised of that legal right through judicial precedent. Thus, state officials' awareness of a patient's risk of immediate suicide while the patient is under their custodial care, coupled with their deliberate indifference as to that patient's death, constitutes sufficient culpability such that qualified immunity should not protect their actions. State officials' knowledge of the voluntary nature of a patient's confinement should not effect their culpability, just as their ignorance of the involuntary nature of a patient's confinement would not effect whether the plaintiff's right was clearly established and the state officials' actions clearly illegal.

This holding is not inconsistent with the central purpose of qualified immunity. Qualified immunity protects public officials " 'from undue interference with their duties

and from potentially disabling threats of liability.' " *Elder,* —— U.S. at ——, 114 S.Ct. at 1022 (citing *Harlow,* 457 U.S. at 806, 102 S.Ct. at 2732). "The purpose of [qualified immunity] is to protect officials from legal surprises." *Nelson v. Streeter,* 16 F.3d 145, 151 (7th Cir.1994). The absence of case law directly on point does not necessarily establish immunity. *Id.* Therefore, imputing state officials with the knowledge, objectively viewed, that they owe no less of a duty to voluntarily committed patients as they owe to involuntarily committed patients will not interfere with their official duties. It is reasonably foreseeable that patients under the state's care may commit suicide if the state officials are deliberately indifferent to their known suicidal conditions while housed at the state's custodial mental health center. Accordingly, defendants are not entitled to qualified immunity under the facts as pleaded in the complaint.

██ Defendants Jackson and Turner—but not Cast—also claim qualified immunity under state law. State officials and employees are entitled to qualified immunity from personal liability under Illinois tort law for discretionary acts. *Hanzel Constr., Inc. v. Wehde & Southwick, Inc.,* 130 Ill.App.3d 196, 85 Ill.Dec. 624, 627–28, 474 N.E.2d 38, 41–42 (1985). "In determining whether an act is discretionary for public official immunity purposes, the act, in addition to involving skill or judgment, must be governmental in character." *Janes v. Albergo,* 254 Ill.App.3d 951, 193 Ill.Dec. 576, 587, 626 N.E.2d 1127, 1138 (1993). That is, the actions and duties involved in the case must be "unique to a particular public office." *Id.* The duties of a physician in his or her diagnosis and treatment of an individual are not unique to a particular public office and are thus not the type of activities protected by public official immunity. *Id.; see also Madden v. Kuehn,* 56 Ill.App.3d 997, 14 Ill.Dec. 852, 855–56, 372 N.E.2d 1131, 1134–35 (1978). Officials who are " 'engaged in the same endeavors and functions as those performed by their counterparts in private practice' " are not protected by public official immunity. *Janes,* 193 Ill.Dec. at 587, 626 N.E.2d at 1138 (quoting *Watson v. St. Anne's Hosp.,* 68 Ill.App.3d 1048, 25 Ill.Dec. 411, 416, 386 N.E.2d 885, 890 (1979)).

The complaint alleges that all defendants had a duty to protect the individuals in their custody or in restraint and seclusion. While many of the allegations concern a failure to implement procedures and policies, the complaint does allege involvement on the part of all remaining defendants regarding the treatment of Cassara while he was subject to defendants' care and custody. Specifically, the complaint's allegations include that defendants failed to monitor or inspect Cassara and failed to remove the comb and socks from Cassara when they placed him in the restraint/seclusion room. Although the precise individual roles in the care and treatment of Cassara are not alleged, the court can infer at the pleading stage of this case that each of these remaining defendants was an active participant in Cassara's care, placement, and treatment. The facts which may tend to provide the basis for distinguishing this case from *Janes* and *Madden,* and place it more in line with *Midamerica Trust Co. v. Moffatt,* 158 Ill.App.3d 372, 110 Ill.Dec. 787, 792, 511 N.E.2d 964, 969 (1987) or *Kilcoyne v. Paelmo,* 204 Ill.App.3d 139, 149 Ill.Dec. 767, 770, 562 N.E.2d 231, 234 (1990) are not apparent on the face of the complaint.

██ The court now turns to plaintiff's state law claims. Counts II and III of the complaint allege, respectively, a claim for wrongful death under the Illinois Wrongful Death Act, 740 ILCS 180/0.01 *et seq.* and rights under the Illinois Survival Act, 755 ILCS 5/27–6. Plaintiff concedes that count II must be amended to include the correct beneficiary and thus count II is dismissed on that basis. Further, plaintiff has failed to meet the requirements under Illinois law for healing art malpractice cases. Under 735 ILCS 5/2–622, a plaintiff must attach to a complaint an affidavit from a knowledgeable health professional attesting that there is a reasonable and meritorious cause for filing an action. This requirement is applicable to federal district court filings. *Landstrom v. Illinois Department of Children and Family Servs.,* 699 F.Supp. 1270, 1282 (N.D.Ill.1988), *aff'd,* 892 F.2d 670 (7th Cir.1990). Plaintiff's failure to comply with 735 ILCS 5/2–622 requires dismissal of count II without prejudice.

As for count III, there are sufficient allegations that, as a proximate and direct result

282

of the defendants' negligence, Cassara suffered pain and suffering prior to his death. A complaint's mere vagueness or lack of detail is not sufficient to justify a dismissal, *Strauss,* 760 F.2d at 767, and a complaint need not specify the correct legal theory nor point to the right statute to survive a motion to dismiss, *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1134–35 (7th Cir.1992) (citing *Bartholet v. Reishauer A.G.,* 953 F.2d 1073, 1078 (7th Cir.1992)). Further, the court will not ignore the allegation of self-strangulation by use of socks and a comb. Accordingly, the absence of factual specificity in the complaint as to Cassara's pain and suffering preceding his death and the failure of the complaint to cite correctly to 755 ILCS 5/27–6 are not sufficient to warrant dismissal. Nonetheless, in so far as the survival action depends upon the malpractice action alleged in count II, and no affidavit pursuant to 735 ILCS 5/2–622 was filed, count III is dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are denied in part and granted in part. Counts II and III are dismissed without prejudice.

IT IS SO ORDERED.