**Dorothy MATHIS, individually and as Special Administrator for Jerome Mathis, deceased, Plaintiff–Appellant,**

**v.**

**J.W. FAIRMAN, in his official capacity as Executive Director, Cook County Department of Corrections, and Gerome Jenkins, Defendants–Appellees.**

No. 96–1160.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1996.

Decided July 24, 1997.

Kenneth N. Flaxman (argued), Lesley A. Redman, Chicago, IL, for plaintiff–appellant.

Richard A. Devine, David S. Meyerson (argued), Office of the State's Attorney of Cook County, Chicago, IL, for James W. Fairman, Jr. and Gerome Jenkins.

Richard A. Devine, Office of the State's Attorney of Cook County, Chicago, IL, for Cook County Department of Corrections.

Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Jerome Mathis committed suicide while incarcerated at the Cook County Jail, awaiting trial on a murder charge. His mother, Dorothy Mathis, filed suit against Gerome Jenkins, one of the cadets (guards in training) at the jail, as well as J.W. Fairman, the Executive Director of the Cook County Department of Corrections. She contended that Jenkins' indifference to her son's condition, as well as the jail's failure to adequately staff the jail and to train its employees, proximately caused her son's death, in violation of the due process clause of the Fourteenth Amendment. The district court entered summary judgment in favor of the defendants, concluding that the record did not reveal a triable question of fact as to whether the defendants were deliberately indifferent to Mathis' condition. We affirm the grant of summary judgment.

The pertinent facts are as follows. On June 9, 1991, Jenkins reported for work a bit after 8:00 a.m. for duty on Tier 1–D, Division 5 of the jail, a non-aggressive, protective custody tier where Mathis was housed. This was Jenkins' first day on the job: he had been hired less than a week earlier and had just completed a four or five-day orientation. He was responsible for supervising approximately twenty-five inmates. While making a visual check of the tier, Jenkins noticed Mathis mumbling to himself in the day room. When Jenkins approached Mathis, Mathis told him that an unnamed individual was going to kill him. Jenkins testified that he reported this to his supervisor, Lieutenant Henry Troka, although Troka did not recall the conversation. Troka's subsequent report did reflect that he spoke to Mathis himself that day, however. Troka did not believe that Mathis was in any serious risk of danger from anyone else, but decided to have Mathis transferred to a single cell just to be sure. He also concluded that Mathis ought to be given a psychological examination. Paramedic Scott Birmingham subsequently reached the same conclusion. He visited the tier at around 9:30 that morning and later spoke to Mathis for about ten minutes at the request of the prison staff. Mathis told Birmingham "that he was hearing voices of somebody wanting to kill him or he wanted to kill himself." Birmingham prepared a written request for a psychiatric consultation (over Mathis' objection) and sent Mathis in the company of a guard to Cermak Health Services, which provided health care to the inmate population. The record indicates that this occurred at some time between 10:00

and 11:00 a.m.[1] Mental Health Specialist Constance Williams conducted an evaluation, and concluded that Mathis was stable and needed no psychological or psychiatric treatment. Mathis denied any suicidal impulses, revealed no history of psychological problems, and expressed the desire to be returned to his cell. He was, in fact returned to the tier, where he evidently remained concerned that someone was attempting to kill him. He telephoned his family expressing that worry, and in deference to Mathis' concern, the tier's logbook indicated that a close eye was to be kept upon him. According to Jenkins, Mathis was checked on every thirty minutes until the end of Jenkins' shift at 4:00 p.m. Jenkins indicated that at 3:55 p.m., he did a final visual check on Mathis, who repeated that someone was out to get him. Shortly before four o'clock, Jenkins was relieved by Melvertis Little. When Little conducted a visual inspection of the tier a short time later, she discovered Mathis hanging from a torn bed sheet that he had wrapped around an air vent in his cell. Officers cut him down within moments, and medical personnel arrived shortly thereafter. CPR was administered, but to no avail. At 4:52 p.m., Mathis was pronounced dead at a local hospital.

The district court concluded in a thorough analysis that the evidence did not support a due process claim against either Jenkins or Fairman. With respect to Jenkins, the court found that the facts at most suggested that Mathis had been acting strangely, which was not by itself sufficient notice that Mathis might harm himself. *See* Mem. and Order at 7, 1995 WL 769139, citing *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir.), *cert. denied*, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983). The court noted that Mathis had no known history of mental illness or attempted suicide, and when sent for a psychological evaluation on the day of his death was determined not to present a risk to himself. Mem. and Order at 7–8. At the same time, Jenkins had exhibited no deliberate indifference to Mathis: he had reported Mathis' strange behavior to his superior earlier in the day, and had checked upon him regularly thereafter until moments before Mathis killed himself. *Id.* at 8–9. In that regard, the court rejected the plaintiff's suggestion that the logbooks and other documentation reflecting the defendants' efforts had been doctored to cover up their own failure to monitor Mathis. *Id.* at 10–13. In particular, the court did not think it significant that paramedic Birmingham, who was summoned immediately after Mathis was found dead, described the body as "cold" at 4:02 p.m. The plaintiff argued that if the body was already cold at that hour, Mathis must have already been dead for quite some time, which would in turn suggest that Jenkins had not, in fact, been checking on Mathis regularly that afternoon and had certainly not looked in on him at 3:55 p.m. But the reports of the Cook County Medical Examiner and a police detective who had investigated Mathis' death both indicated that Mathis' body was still warm much later, after Mathis had been taken to the hospital. The district court attributed the apparent conflict to the likelihood that medical personnel employ different means of determining when a body becomes cold, especially when that assessment is based merely on touch, which it apparently had been here. Consequently, the court did not believe that a material question of fact was presented as to just how long Mathis had been dead before his body was discovered. Finally, the court found insufficient evidence to support a finding that the jail had been inadequately staffed and that its guards had been inadequately trained. The court had before it evidence that suicides at the jail had dropped dramatically since 1980, even as the jail population had nearly tripled. Staffing complied with the mandates of state law, and although

---

1. Ms. Mathis suggests that the evaluation was actually done much earlier in the day. An entry in the jail's logbook indicates that Mathis was "sent out" at 6:20 a.m. and that he was making remarks to the effect that "someone was going to kill him." However, the logbook also indicates that at 10:17 a.m., Mathis "was taken to psyco [sic] ward." That is consistent with the report that Troka prepared after Mathis' death; it is also roughly consistent with Birmingham's notation that he had spoken to Mathis and sent him for the evaluation between 10:30 and 11:00 a.m. Most compellingly, it jibes with the undisputed fact that Constance Williams, the specialist who evaluated Mathis, did not report for work until 10:02 a.m. that day.

guards occasionally worked alone, as Jenkins did, the record indicated that on the date of Mathis' death, several other officers were present on the tier and that officers from other tiers were able to respond to trouble within moments, as they did when Mathis was discovered hanging in his cell. Finally, although cadets like Jenkins may not have been trained in suicide prevention, the jail maintained a psychiatric unit for that purpose. *Id.* at 13–17.

■ The focus of Ms. Mathis' appeal is on the district court's conclusion that Mathis did not kill himself until sometime between 3:55 p.m., when Jenkins said he last checked on him, and around or shortly after 4:00 p.m., when the jail staff claimed they found him dead. Ms. Mathis makes two arguments in this regard. First, she contends that it was inappropriate for the district court on summary judgment to assume that Mathis' body was not already cold by the time his suicide was discovered, given the facial conflict between Birmingham's report and the reports of the medical examiner and the detective. She argues second that the district court should not have taken into consideration at all the latter two reports, given that they were first submitted with the defendants' reply memorandum below. *See Black v. TIC Investment Corp.*, 900 F.2d 112, 116 (7th Cir.1990) (new evidence submitted on reply should not be considered on summary judgment unless non-movant is given opportunity to respond).[2]

Whether Mathis' body was indeed cold at four o'clock is a red herring, however. We shall assume, for the sake of argument, that it indeed was cold by that time as Ms. Mathis argues and assume further that her son had already been dead for quite awhile before jail personnel discovered what he had done. The latter assumption would put the veracity of Jenkins' averment that he checked on Mathis every half hour until 3:55 into question. That might, in turn, open the door to a finding that Jenkins did not follow his superior's order (as reflected in the logbook) to keep a close eye on Mathis that day; but the possibility of such a finding would not by itself suffice to win Ms. Mathis a trial.

■ This case founders on the requirement that there be proof of the defendants' knowledge that Mathis posed a danger to himself. A prison official violates the Eighth Amendment (which applies to persons who have been convicted) and the due process clause of the Fourteenth Amendment (which applies to pre-trial detainees like Mathis) when he is deliberately indifferent to a substantial risk of serious harm to an inmate, and a finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless. *Farmer v. Brennan*, 511 U.S. 825, 840–42, 114 S.Ct. 1970, 1980–81, 128 L.Ed.2d 811 (1994); *see also Salazar v. City of Chicago*, 940 F.2d 233, 238–41 (7th Cir.1991).[3] There is no dispute in this case that jail personnel knew Mathis was behaving strangely. They were concerned enough to have the paramedic speak with him, to have him evaluated psychologically, and, in deference to his fear that someone was trying to kill him, to have him placed in a single cell. But after evaluating Mathis, the mental health specialist concluded that Mathis did not pose a danger to himself and should be

---

2. It is not clear whether the reports were "new" in the sense that the plaintiff and her counsel had not seen them before or "new" only in the sense that the defendants had not cited them in their initial summary judgment materials. We note that the record reflects neither an objection to the late citation of the reports in the defendants' reply memorandum nor a request for leave to file a surreply or otherwise to respond to this evidence. *Contrast Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996), *petition for cert. filed*, 65 U.S.L.W. 3756 (May 5, 1997) (No. 96–1770). Even at this juncture, Ms. Mathis has not indicated what she would have done if given the opportunity to respond to the reports and the arguments that the defendants made in reliance upon

them. In any case, for the reasons that follow, we need not resolve this issue.

3. The rights of a pre-trial detainee under the due process clause of the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Whether they are greater is an unsettled question that the plaintiff does not pursue here. *See Estate of Cole v. Fromm*, 94 F.3d 254, 259 n. 1 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997).

returned to the general population. At that point, as far as Jenkins and the other prison officials were concerned, any questions as to whether Mathis might kill himself had been resolved. We inquired at argument whether Constance Williams' conclusions were communicated to the jail staff, and we were told there was no evidence that they were. No matter. It was clear enough from Williams' decision to return Mathis to the general population of the prison rather than keeping him for observation in the psychiatric unit that she did not believe Mathis to be in danger. At that juncture then, Jenkins and the other guards had no notice of any suicidal tendencies or intent in Mathis. Although Mathis' odd behavior apparently continued that afternoon, there is no evidence that his behavior changed in a way that made the jail staff aware that he might harm himself. *Contrast Hall v. Ryan,* 957 F.2d 402, 405–06 (7th Cir.1992); *Bragado v. City of Zion/Police Dep't,* 788 F.Supp. 366, 371–72 (N.D.Ill.1992), 839 F.Supp. 551, 553–54 (N.D.Ill.1993). The most that can be said, then, is that Jenkins and his colleagues were negligent in failing to keep a closer eye on Mathis than they did. That will not support the requisite finding of deliberate indifference, however. *See generally Farmer,* 511 U.S. at 835, 114 S.Ct. at 1977–78; *Langston v. Peters,* 100 F.3d 1235, 1237–38 (7th Cir.1996); *Vance v. Peters,* 97 F.3d 987, 991–92 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997); *see also, e.g., Camic,* 712 F.2d at 1146.

We therefore AFFIRM the grant of summary judgment in favor of the defendants.